WILBURT P. PARKHURST, demandante y apelante, *v.* NORMAN E. PARKHURST ET AL., demandados y apelados.

Número 10847.

*Sometido:* 2 de noviembre de 1952.   *Resuelto:* 10 de marzo de 1954.

*McConnell & Valdés* y *Elmer Toro Lucchetti,* abogados del apelante; *Héctor González Blanes,* abogado de los apelados.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del tribunal.

Durante muchos años la Parkhurst Canning Company, una corporación doméstica, se dedicó al cultivo, cosecho, enlatado y venta de productos de la piña. Sus únicos accionistas y directores lo fueron siempre Wilburt P. Parkhurst y sus dos hijos Norman y Charles. Wilburt fué siempre el presidente de la corporación y Norman y Charles, secretario y tesorero, respectivamente. Para el año 1940 la corporación se hallaba en pésimas condiciones económicas, por lo que su presidente hizo infructuosamente varias gestiones para conseguir préstamos con que seguir trabajando. Los bienes de la corporación para dicho año consistían de dos fincas radicadas en Bayamón. Una de ellas, llamada "Aurora" o "Minillas" era agrícola y estaba dedicada a la siembra de piñas. La otra finca era una parcela de 14.4 cuerdas, ubicada en el barrio Hato Tejas, y era donde se hallaba la fábrica de enlatado (*cannery*). Aparentemente la corporación no tenía bienes muebles de valor sustancial, aparte del valor que pudieran tener sus marcas de fábrica y plusvalía (*"good will"*).

Por resolución de 24 de junio de 1941 los accionistas de la corporación acordaron vender a Norman la finca "Aurora" por precio de $28,000, pagadero en la siguiente forma: (*a*) el comprador pagaría la hipoteca de aproximadamente $5,000 a favor de The Federal Intermediate Credit Bank of Baltimore; (*b*) $7,000 serían abonados por la vendedora al comprador para saldar la deuda que aquélla tenía con éste; y (*c*) el balance de $16,000 sería satisfecho por el comprador dentro de 90 días a partir del otorgamiento de la escritura de venta. El contrato se formalizó mediante la escritura número 9 otorgada en 27 de junio de 1941 ante el notario Walter L. Newsom, Jr. Posteriormente y dentro del término convenido, Norman pagó a la corporación vendedora el precio aplazado de $16,000. También pagó la hipoteca a The Federal Intermediate Credit Bank of Baltimore.

En una reunión especial celebrada por los directores de la corporación, en junio 26 de 1941, se acordó por unanimidad vender a Norman y Charles la otra finca de 14.4 cuerdas ubicada en el barrio Hato Tejas, por un precio de $50,000 de los cuales ya se le había satisfecho a la vendedora $10,000 y el balance de $40,000 sería pagado en la siguiente forma: (*a*) $15,000 dentro de 90 días a partir de junio 27 de 1941 y (*b*) los compradores asumirían la obligación de pagar un pagaré al portador por $25,000 que estaba garantizado con hipoteca sobre dicha finca. El contrato se formalizó mediante la escritura número 10, otorgada el 27 de junio de 1941, ante el notario Walter L. Newsom. En virtud de esta escritura Norman y Charles adquirieron cada uno de ellos un condominio de una mitad indivisa en la referida finca. Los compradores pagaron oportunamente a la corporación vendedora el precio aplazado de $15,000.

En 27 de junio de 1941, los tres accionistas acordaron la disolución de la corporación, y continuaron actuando, por ser ellos también sus directores, como síndicos liquidadores. A partir de dicha fecha el padre y sus dos hijos continuaron explotando el mismo negocio que explotaba la corporación. Así las cosas, en 1943 surgen desavenencias entre Norman y su hermano Charles, y es entonces cuando en junio 14 de dicho año aquél le escribe a éste proponiéndole que dividan lo que tienen. Por escritura otorgada en septiembre 5 de 1943, Norman le vende a Charles por $25,000 la finca "Aurora" o "Minillas", que era la dedicada a la siembra de piñas. Quince días después y también por escrituras públicas, los hermanos Parkhurst realizan las siguientes operaciones:[1] (1) Cancelan, por confusión de derechos, la hipoteca de $25,000 que gravaba la finca de 14:4 cuerdas y al mismo tiempo segregan de dicha finca una parcela de 2.83 cuerdas, en la cual enclavan

---

[1] Estas son las escrituras números 140 y 141 de 20 de septiembre de 1943, respectivamente, otorgadas ante el notario Francisco Fernández Cuyar.

una casa residencia y un almacén, y (2) Charles le vende a Norman por $25,000, sus condominios de una mitad en las dos fincas que antes formaban la de 14.4 cuerdas.

En enero 8 de 1945, y por la escritura número 6 otorgada ante el notario Héctor González Blanes, Norman dió en arrendamiento a su padre la parcela de 2.83 cuerdas, con exclusión del almacén, por un término que sería igual a la vida natural del arrendatario y por un canon de $1 y otras consideraciones que es innecesario relatar ahora.

En septiembre de 1948, Wilburt P. Parkhurst radicó una extensa demanda ante la extinta Corte de Distrito de Bayamón, contra sus hijos Norman y Charles, las esposas respectivas de éstos, la Parkhurst Canning Company y el Crédito y Ahorro Ponceño.

En la primera causa de acción el demandante alega, en síntesis, que en las dos escrituras otorgadas por la corporación Parkhurst Canning Company vendiendo sus bienes inmuebles a Norman y a Charles Parkhurst, no medió causa o consideración, siendo simuladas dichas ventas, y que tanto estos contratos de compraventa como la disolución de la corporación constituían parte de un plan fraudulento concebido y puesto en ejecución por el demandado Norman Parkhurst en 1941, mediante el cual éste se hizo dueño de sustancialmente todos los bienes de la corporación; que a pesar de estas ventas simuladas y de la disolución de la corporación, no se liquidaron ni distribuyeron los demás bienes corporativos sino que aquélla continuó haciendo negocios sin interrupción, haciendo uso para tal fin de los bienes enajenados hasta junio de 1943; que en junio 27 de 1943 y por motivos de salud, el demandante propuso a sus hijos Norman y Charles y éstos aceptaron, la distribución de los bienes corporativos en la siguiente forma: (a) después del pago o de haberse hecho arreglos para el pago de las deudas corporativas, el remanente líquido neto se distribuiría por partes iguales entre Norman y Charles; (b) que el demandado a quien tocase la planta de enlatado

debería segregar de la finca en que la misma enclava, una parcela de 2.83 cuerdas y traspasarle el dominio al demandante y además dicho demandado pagaría al demandante durante toda la vida natural de éste, la suma de $2,000 anuales para sus alimentos, y (c) que el demandado a quien tocase la finca "Minillas" pagaría al demandante por término igual al dicho, la suma de $1,000 anuales; que Norman y Charles convinieron entre sí que al primero se le adjudicaría la planta de enlatado y al segundo la finca "Minillas", otorgándose al efecto, las correspondientes escrituras, luego de segregarse la parcela de 2.83 cuerdas de la finca donde enclava la planta de enlatado; que el demandante tomó posesión de la parcela así segregada y construyó en ella su residencia; que a partir de esa fecha el demandante ha venido solicitando del demandado Norman Parkhurst que le traspase el dominio de las 2.83 cuerdas y le pase los $2,000 anuales, pero éste, sin negar la existencia de tal obligación, ha venido excusándose hasta que en 8 de enero de 1945, temeroso el demandante de perder lo que había invertido en la susodicha parcela y ante la negativa de Norman de traspasarle el dominio de la misma, aceptó un arrendamiento por el término de vida natural del demandante.

En la segunda causa de acción se alega que al negarse Norman a hacer los pagos anuales de $2,000, dicho demandado ha negado alimentos al demandante de acuerdo con las disposiciones del artículo 590 del Código Civil, y que en su consecuencia el demandante revoca la donación a Norman de los bienes de la corporación.

En la tercera causa de acción se alega que Norman ha venido explotando para sí los bienes de la corporación desde junio 27 de 1943, beneficiándose de sus marcas de fábrica y plusvalía, habiendo recibido como frutos de dicha explotación una suma que excede de $500,000 y la cual pertenece a la corporación, cuyo único accionista lo es el demandante. Se solicita que Norman rinda las cuentas correspondientes.

En la cuarta causa de acción se alega que la corporación no ha sido liquidada y que sus bienes han pasado a manos de uno de sus síndicos, a saber, de Norman Parkhurst, habiendo éste violado sus obligaciones como tal síndico porque (a) ha traspasado sin causa o consideración la planta de enlatado; (b) se ha apropiado y ha hecho uso para su personal beneficio de la plusvalía, de las marcas de fábrica y de otros bienes de la corporación y con dichos bienes ha conducido un negocio para su exclusivo lucro personal.

La demanda termina con una extensa súplica. Substancialmente se solicita de la corte una sentencia con los siguientes pronunciamientos: (1) se declare que el demandante es dueño de todas las acciones del capital de la corporación Parkhurst Canning Co., se ordene la cancelación de las que aparezcan a nombre de Norman y de Charles y se ordene a éstos entregar al demandante, los libros, cuentas, documentos y récords de la corporación así como todos los bienes y propiedades corporativas; (2) que se anulen las escrituras número 10 de 27 de junio de 1941 ante el notario Walter L. Newsom, Jr., y las números 140 y 141 de 20 de septiembre de 1943 ante el notario F. Fernández Cuyar; (3) que se ordene al demandado Norman rendir cuentas de la operación de la planta de enlatado; (4) que se ordene a Norman y a Charles rendir cuentas como síndicos liquidadores de la corporación y entreguen los bienes de la corporación al demandante después de pagar las deudas y obligaciones corporativas con excepción de la finca "Minillas" y (5) se conceda al demandante cualquier otro remedio procedente en derecho.

Contestaron la demanda Norman E. Parkhurst y su esposa.(²) En cuanto a la primera causa de acción aceptaron algunos hechos y negaron otros. Además explicaron la naturaleza de las distintas transacciones realizadas entre los de-

___

(²) Se le anotó la rebeldía a los demás demandados con excepción del Crédito y Ahorro Ponceño que nunca fué emplazado, ni se solicitaba remedio alguno en su contra.

mandados y el demandante alegando afirmativamente, que dichas transacciones fueron hechas mediando causa y consideración; que el demandante se separó en 1943 del negocio que había continuado con sus dos hijos a partir de la disolución de la corporación, habiéndose hecho entonces la liquidación final del mismo y procediendo el demandante a retirar el importe íntegro de su deuda; que en esta forma el demandante varió el plan original que había propuesto a sus hijos en 1941, al efecto de que éstos le pasarían una pensión de $1,500 anuales y le darían en arrendamiento por el término de su vida natural la parcela de 2.83 cuerdas en vista de que no se le podía liquidar en efectivo cierta deuda de la corporación a su favor.

Los hechos esenciales de la segunda, tercera y cuarta causas de acción fueron también negados. Como defensa alegaron que la demanda no aducía hechos constitutivos de causa de acción y que todas las causas de acción ejercitadas estaban prescritas.

Después de celebrarse un juicio en los méritos, el tribunal a quo dictó sentencia declarando sin lugar la demanda en todas sus partes y condenando al demandante al pago de las costas y $1,000 para honorarios de abogado.

Contra dicha sentencia interpuso el demandante el presente recurso de apelación, imputando a la corte sentenciadora la comisión de cinco errores. Antes de pasar a la discusión de estos errores precisa consignar aquí un resumen de las conclusiones de hecho del tribunal a quo. Las cuestiones envueltas en el caso las sintetiza dicho tribunal en la siguiente forma:

"En la presente acción surgen, como las más importantes, dos proposiciones:

"Una, si medió o no influencia indebida en el otorgamiento de dos escrituras de compraventa celebradas en 27 de junio de 1941 y en cuya virtud la corporación Parkhurst Canning Company traspasó los dos únicos inmuebles de que entonces fuera dueña (consistentes en una finca denominada la 'Aurora' y cierta par-

cela de unas 14 cuerdas donde ubicarán las edificaciones utilizadas en la industria de frutas y jugos enlatados). La primera finca fué vendida a Norman E. Parkhurst y la segunda, o sea, la parcela de 14 cuerdas donde ubica la planta de enlatado, a éste y a su hermano Charles, correspondiendo a cada uno una mitad en común proindiviso.

"Otra, si, luego de disuelta la corporación, los síndicos liquidadores procedieron o no a la liquidación y distribución correspondientes del capital corporativo.

"Las demás cuestiones a ser resueltas se originan en la reclamación del demandante sobre ciertas concesiones particulares que alega él haberse establecido a su favor con motivo de la liquidación de la corporación y al amparo de unos supuestos entendidos habidos entre él y los demandados. Con respecto a éstas toca al tribunal determinar: (1) si medió o no contrato de alguna naturaleza entre el demandante y el demandado Norman E. Parkhurst, por el que viniera este último obligado a pasarle una anualidad o pensión alimenticia de dos mil dólares, y (2) si, además, quedó obligado Norman E. Parkhurst a otorgarle un título en pleno dominio sobre cierta parcela de terreno (2.83 cuerdas) que dicho demandante recibiera en arrendamiento en el año 1945.

"Para sostener sus contenciones el demandante impugna la legitimidad de una serie de operaciones contenidas en documentos públicos y llevados a efecto ante los notarios Walter L. Newsom, Enrique Córdova Díaz, Francisco Fernández Cuyar, H. González Blanes y Gaspar Rivera Cestero. El primero de éstos fué además abogado de la corporación."

En cuanto a la escritura número 9 de 27 de junio de 1941 otorgada ante el notario Walter L. Newsom, Jr., en virtud de la cual la corporación Parkhurst Canning Company vendió al demandado Norman E. Parkhurst, la finca "Minillas" por precio de $28,000 el tribunal a quo concluyó, que dicha venta se efectuó por una causa cierta y sin que mediara influencia indebida por parte del comprador; que la corporación acordó formalmente la referida venta e instruyó a su Presidente, el demandante y apelante, para que otorgara la correspondiente

escritura; que la corporación adeudaba a Norman la cantidad de $7,000, suma ésta que se incluyó como parte del precio de venta; que Norman asumió el pago a nombre de la corporación de la deuda hipotecaria a favor del Federal Intermediate Credit Bank of Baltimore por $5,000, cuyo saldo recibió éste según la escritura número 68 otorgada en agosto 21 de 1941 ante el notario Enrique Córdova Díaz; que Norman contrajo personalmente una deuda con el Federal Land Bank por $16,000, con cuya suma satisfizo la parte del precio aplazado a la vendedora Parkhurst Canning Company según ésta lo reconoció en la escritura pública número 67 otorgada ante el notario Enrique Córdova Díaz; que el precio pagado por Norman resulta ser sustancialmente mayor que el que pagara la corporación por dicha finca en 1937.

Concluyó igualmente la corte a quo que en la escritura número 10 de 27 de junio de 1941 otorgada ante el mismo notario Walter L. Newsom, Jr. y en virtud de la. cual la corporación Parkhurst Canning Company vendió a Charles y a Norman Parkhurst la finca de 14 cuerdas donde radica la planta de enlatado (*cannery*), medió causa o consideración, no siendo simulada dicha venta ni habiéndose ejercido indebida influencia en su otorgamiento; que la deuda de la corporación por $10,000 a favor de Charles y Norman, que aquélla aceptó como parte del precio de venta, era una deuda legítima según aparecía de los libros de la corporación y según lo aceptó el propio demandante el día del juicio; que los compradores satisficieron a la corporación el precio aplazado de $15,000 y además asumieron el pago de una obligación hipotecaria por $25,000 que obraba en poder del Royal Bank of Canada en garantía de una deuda de la corporación por $29,983.60 según aparecía de las hojas de balance preparadas por su tesorero Charles W. Parkhurst.

Concluyó también la corte sentenciadora, que a fines de 1943 se efectuó la liquidación y distribución de los bienes corporativos existentes después de su disolución, y respecto al

traspaso del dominio de la parcela de 2.83 cuerdas y la anualidad convenida a favor del demandante, se expresó así dicha corte:

"(10) La corte entiende que desde antes de hacerse esta liquidación el demandante interesaba obtener el usufructo de una parcela de terreno, constante en unas 2.83 cuerdas, sitas en los terrenos de la fábrica, lugar éste en que él vivía y que tal concesión se le otorgó finalmente por el demandado Norman E. Parkhurst, quien, mediante compra a Charles y su esposa, de su condominio, pasó a ser dueño de la totalidad del inmueble. El tribunal ha dado crédito a la prueba relativa al interés del demandante en el uso de dicha porción de terreno con el fin de edificar en la misma una casa, así como aquélla relacionada con el contrato de arrendamiento por el término de la vida natural del demandante otorgado en el 1945 ante el notario Héctor González Blanes, siendo en esta forma que se consumó el acuerdo sobre el particular habido entre aquél y su hijo Norman. La corte no ha creído que hubiese habido convenio alguno para traspasar la referida parcela en pleno dominio al demandante.

"(11) Considera establecido este tribunal también: que allá para el 1941 las propiedades estuvieron fuertemente comprometidas, siendo difícil determinar, de acuerdo con la mala situación que la prueba demuestra (inclusive las hojas de balance de ese año en evidencia) si el valor de las propiedades alcanzaba a cubrir acaso el montante de sus obligaciones; que no había dinero en efectivo; que la corporación tuvo una pérdida ese año, siendo problemático si podría ésta subsistir o no, por lo que se acordó la disolución. La corte cree que en tales circunstancias se proyectó un plan por los accionistas todos, a tenor del cual las propiedades, gravadas como estaban, serían vendidas por la corporación a Norman E. Parkhurst y a Charles W. Parkhurst, bajo las condiciones onerosas que aparecen de las escrituras número 9 (nueve) y número 10 (diez) otorgadas ante el notario señor Walter L. Newsom, con el propósito también de que una vez adquiridas dichas propiedades y disuelta y liquidados los asuntos de la corporación, el negocio, de ser posible, continuase siendo explotado por los hijos del demandante. Cree el tribunal que el demandante proyectaba, en aquella época, que luego de compradas las propiedades gravadas por, y de asumir los hijos el control del negocio, en el mal estado en que estaba, él podría pedir para sí el pago de una 'anualidad', aparte ello del usu-

fructo que él interesaba de una pequeña parcela de terreno (2.83) cuerdas en los terrenos de la fábrica. La corte considera, asimismo, probaõo que, en esa fecha, y en ese estado de cosas, el demandante alegaba que la corporación le era deudora de un interés que dicho demandante valoraba en unos $23,435.15, siendo en pago de este referido interés (el cual era sabido no poder hacer efectivo la corporación por no tener fondos) que recabara el demandante de sus hijos, el pago õe una anualidad o renta. Hubo, primero, el propósito de fijar esa anualidad o renta en cierta suma menor y finalmente en $3,000 anuales. Concluye la corte, no obstante, que este arreglo proyectado, que fué objeto de consideración por parte del demandante y el cual, en principio, estuvieron dispuestos a aceptar los demandaõos Norman E. Parkhurst y Charles W. Parkhurst, no llegó a perfeccionarse o materializarse. El mismo estuvo en mente del demandante hasta poco antes de la liquidación, o sea, desde el 1941 al 1943; pero, en este último año, viendo el demandante que las ganancias aumentaban en forma inesperada empezó a adjudicarse los beneficios y, entonces, en lugar de la anualidad que él proyectaba pedir, optó por retirar y retiró su alegada participación o interés en efectivo, más otras cantidades adicionales que, teniendo él el control de los fondos, le fué fácil adjudicarse. Con esto quedó sin efecto el proyectado plan de la anualidad, dándose el demandante por satisfecho."

██ ██ Pasamos ahora a discutir los errores señalados por el demandante-apelante. Habiéndose anotado por el secretario del tribunal a quo la rebeldía de todos los demandados con excepción del Banco Crédito y Ahorro Ponceño que nunca fué emplazado, el demandante solicitó de dicha corte que dictara sentencia en rebeldía en cuanto a la primera y la segunda causa de acción y que en cuanto a las otras dos causas de acción dictara una orden nombrando un *master*, de acuerdo con la Regla 55 de las de Enjuiciamiento Civil "para que dicho *master* fije el estado de las cuentas mencionadas en la tercera y cuarta causa de acción." Posteriormente, advertido el secretario de la referida corte que los demandados Norman E. Parkhurst y su esposa Lavinia Mitchell Parkhurst no estaban en rebeldía porque habían comparecido en tiempo radicando

una moción de desestimación, dejó sin efecto la anotación de la rebeldía de estos demandados. Después de celebrarse una vista la corte a quo declaró sin lugar la solicitud del demandante para que se dictara sentencia en rebeldía y se nombrara un *master*. Los demandados Norman y su esposa radicaron entonces su contestación a la demanda. Más tarde el demandante solicitó nuevamente el nombramiento de un *master* y una vez más la corte denegó dicha solicitud. En su segundo señalamiento el apelante imputa a la corte a quo haber cometido error y abuso de discreción al rehusar nombrar un *master*.

Este error no fué cometido. La Regla 53 de las de Enjuiciamiento Civil invocada por el apelante dispone que la corte en que estuviere pendiente una acción podrá nombrar un *master* en dicho pleito. Dispone asimismo dicha regla que la encomienda de un asunto a un *master* será la excepción y no la regla y que en cualquier acción, excepto cuando estuvieren envueltas cuestiones de contabilidad, se encomendará el caso a un *master* solamente cuando se demuestre la existencia de circunstancias excepcionales que lo requieran. Además la corte puede especificar o limitar los poderes del *master* a tal extremo que su encomienda puede ser la de recibir evidencia y trasmitir solamente el récord de la misma. Regla 53 (c). Sin embargo, el mero hecho de que en el caso estén envueltas cuestiones de contabilidad, no es suficiente para justificar el nombramiento de un *master*. Debe aparecer que el asunto es complicado y que tomaría indebidamente demasiado tiempo a la corte. *Barrick* v. *Pratt*, 32 F.2d 732; V Moore's *Federal Practice*, pág. 2939. Por otro lado, la corte nombra un *master* solamente para que le ayude en un caso cuando necesita de esa ayuda. El propósito de su nombramiento y actividades es el de que asista a la corte en la determinación de los hechos a fin de que ésta pueda llegar a un resultado correcto en un litigio complicado. *Webster Eisenlohr, Inc.* v. *Kalodner*, 145 F.2d 316, cert. den. 325 U.S.

867. Una de las cuestiones a resolver en este caso era la de si se había o no practicado la liquidación y distribución de los bienes corporativos. De resolverse esta cuestión, como efectivamente fué resuelta por la corte a quo, en la afirmativa, el nombramiento de un *master*, a base de los fundamentos expuestos por el demandante en su solicitud, era obviamente improcedente. Además, de los autos surge que con anterioridad a la celebración del juicio, el demandante solicitó y logró el examen e inspección de todos los documentos que tenía en su poder el demandado Norman Parkhurst y que durante el juicio, el demandante tuvo amplia oportunidad de presentar toda la evidencia que hubiera interesado producir ante el *master*. Como apunta correctamente el apelado, "la circunstancia de que haya sido el propio tribunal inferior, quien interviniera, en lugar de cualquier 'master' en que éste hubiese acaso podido delegar, no opera en contra de su condición superior para conocer del asunto, ni es, por cierto, fundamento para levantar inferencias favorables a la parte demandante. Todo lo contrario, la intervención directa del tribunal comunica, lógicamente, mayor solemnidad y garantía a la investigación judicial . . . . Nada hay que demuestre que ellos [el demandante y su hijo Charles] han podido traer mejor, ni ninguna otra, prueba que la que produjo ante el tribunal inferior."

Los errores tercero y cuarto pueden ser discutidos conjuntamente. El apelante los señala así:

"Tercer Error: El tribunal recurrido cometió error al resolver como cuestión de hecho y de derecho que se había efectuado la completa liquidación de la corporación."

"Cuarto Error: El tribunal cometió error al no ordenar que se restituyeran los bienes de la corporación y al no ordenar a los síndicos liquidadores que procedieran a rendir cuentas sobre la liquidación."

La conclusión de hecho formulada por la corte a quo respecto a haberse llevado a cabo en 1943 la distribución y liqui-

dación de los bienes corporativos existentes después de la diso-
lución de la corporación, encuentra apoyo no solamente en la
prueba del demandado Norman, a la cual dicha corte dió en-
tero crédito, sino que también está sostenida en parte por el
testimonio del propio demandante y el de su testigo Charles
Parkhurst.    Casi al final del examen directo del demandante,
éste declaró que en 1943 había llegado a un acuerdo con sus
dos hijos en virtud del cual éstos le pasarían una pensión de
$3,000 anuales y le darían título de dominio sobre la parcela
de 2.83 cuerdas; que de los treinta o cuarenta mil dólares que
había en el inventario no recibió un centavo, queriendo decir
con ello que no recibió nada cuando el traspaso de las propie-
dades de la corporación.    Sin embargo, al comenzar el con-
trainterrogatorio declaró como sigue:

"P. ¿Pero usted recibió algún dinero?
"R. Yo recibí el dinero de la división que hicimos entre
los tres, pero nada del valor de la propiedad."

Y en relación con la distribución de los referidos bienes
corporativos, su testigo Charles Parkhurst declaró lo si-
guiente:

"P. ¿Entonces en el mil novecientos cuarenta y tres, de
acuerdo con su teoría, hubo una división de buena fe entre los
tres?
"R. Sí, señor.
"P. ¿Y todo quedó dividido según ese acuerdo en el mil nove-
cientos cuarenta y tres?
"R. En el mil novecientos cuarenta y tres, sí.
"P. ¿Ahí fué que hubo una división bona fide?
"R. Sí.
"La Corte:
"P. ¿Entonces el negocio estaba bueno?
"R. Sí, señor.
"P. ¿Y por qué iban a dividir?
"R. Porque yo no quería trabajar con mi hermano, teníamos
diferencias y él me estaba haciendo sufrir mucho.

"Demandados:

"P. ¿Cuánto cogió usted en *cash* en el mil novecientos cuarenta y tres?

"R. Pues muy poco.

"P. ¿Cuánto, más o menos?

"R. ¿Me permite ver la nota que tengo aquí?

"P. ¿Usted me está hablando de cuando se' liquidó en el mil novecientos cuarenta y tres?

"R. Sí. Esa fué la pregunta que usted me hizo. A mi me tocó treinta y siete mil seiscientos ochenta y cuatro pesos con veinte y siete centavos.

"P. Y eso es lo que usted dice que es muy poco.

"R. Porque recibí veinte mil pesos en vacas entonces, y no recuerdo que cantidad mi hermano me dió en efectivo, porque me quedó a deber.

"P. ¿No lo tiene ahí en la nota?

"R. No. Porque él me quedó a deber hasta junio de mil novecientos cuarenta y cuatro, que me debía diez mil pesos, me pagó seis mil y me quedaba a deber cuatro mil pesos para junio de mil novecientos cuarenta y cuatro, o sea un año más tarde.

"P. ¿Usted recibió su participación completa?

"R. Por fin, sí."

Por otro lado, la prueba demuestra que en 1941, cuando la corporación vendió sus bienes inmuebles a Norman y a Charles, aquélla adeudaba al demandante la suma de $23,000, deuda esta que venía arrastrándose en los libros hasta el año 1943. Conforme a lo declarado por el demandado Norman a quien la corte sentenciadora dió entero crédito, al efectuarse la distribución de los bienes corporativos en dicho año de 1943, el demandante prefirió cambiar el plan original que había propuesto a sus hijos en virtud del cual éstos, a cambio de su indicado interés de $23,000, le pasarían una pensión anual y en su lugar optó por retirar y retiró dicho interés en dinero efectivo, adjudicándose la suma de $42,000. Parte de esta suma, según lo demuestra la prueba documental, provenía del producto de las ventas efectuadas en Estados Unidos. Para adjudicarse el producto de estas ventas, el demandante dió órdenes al Corn Exchange National Bank & Trust Co. y

a otras firmas del Continente para que las cantidades cobradas por concepto de embarques se depositasen en su cuenta particular en los Estados Unidos. Mediante la adjudicación de los $42,000 el demandante recibió el pago de la deuda de $23,000 más su participación en el negocio que continuaron sus hijos y él después de disuelta la corporación.

La prueba sostiene igualmente la conclusión de la corte a quo al efecto de que en las ventas de los únicos inmuebles que poseía la corporación medió causa o consideración y que las mismas no eran parte de un plan fraudulento según alegó el demandante, puesto en ejecución por Norman para apoderarse de todos los bienes de dicha corporación. Aceptamos como correctas, después de un detenido estudio de la transcripción de la evidencia y de las conclusiones de hecho y de derecho formuladas por la corte sentenciadora, las observaciones que hace el apelado en su alegato sobre dichas transacciones al expresarse en la forma siguiente:

"Era un hecho aceptado que cuando se llevaron a efecto las ventas aludidas, la Corporación adeudaba a Norman, y a Charles Parkhurst la cantidad de $10,000 (T. de E. págs. 107 y 108). Así también quedó establecido que a Norman, particularmente, la Corporación le adeudaba $7,000. (T. de E. págs. 106; 145.) El propio demandante reconoció tales créditos a favor de sus hijos Norman y Charles, en las escrituras otorgadas por él mismo a nombre de la Corporación ante el notario Newsom. (T. de E. pág. 162 y 180.) Aparece establecido que no sólo se acordó la venta de los inmuebles por la Corporación, sino que las mismas se llevaron a efecto. Respecto a la finca 'Aurora', quedó establecido que el demandado Norman Parkhurst compró la misma por $28,000, la cual satisfizo de la siguiente forma: $7,000 que reconoció adeudarle la Corporación; $5,000 que se reservó para satisfacer el remanente de una deuda contraída por la Corporación con el Intermediate Credit Bank of Baltimore y que estuviera garantizada con una obligación hipotecaria sobre el inmueble por $12,000, la cual cantidad fué satisfecha, cancelando el Banco el gravamen por escritura pública ante E. Córdova Díaz. (T. de E. 239) ; y $16,000 que el demandado satisfizo a la Corporación en el término de 90 días, conforme reconociera

ésta por resolución y por escritura núm. 67 de 20 de agosto de 1941, ante E. Córdova Díaz. (T. E. 171.) Presentóse el recibo del tesorero, sin objeción, de ese pago (T. E. 42). En la venta del otro inmueble, formalizada en la escritura núm. 10 de 27 de junio de 1941, ante Newsom, (T. de E. 180), a más de ser el propio demandante quien concurre de nuevo a nombre de la Corporación, el pago del precio se convino y efectuó como sigue: La Corporación reconoció adeudar a Norman y Charles la suma de $10,000. Esa deuda aparece de los libros de la Corporación y fué constatada en el juicio (T. E. 107 y 108); $15,000 que se obligaron a pagar y pagaron en 90 días. El recibo por el pago de esta cantidad fué aceptado en el juicio. (T. de E. 80 y 81.) Ello, aparte de que el propio apelante, ratificando esa operación de compraventa, comparece en escritura pública número 139 de 20 de septiembre de 1943, ante el notario F. Fernández Cuyar, para reconocer, como síndico liquidador ahora, el pago de ese precio aplazado. Y $25,000 que se reservaron para pagar al portador de un pagaré hipotecario por esa suma, que gravara la propiedad. Rescatado este pagaré se efectuó su cancelación por escritura número 140 de septiembre 20 de 1943, ante F. Fernández Cuyar, comprando, entonces, Norman y su esposa, a Charles y su esposa, la parte de estos últimos, por escritura de igual fecha, otorgada con el número 141, ante el mismo notario (T. de E. 215 y 225), procediendo, en octubre 11 de 1943 a otorgar los primeros otra obligación hipotecaria, por igual suma de $25,000 ante el notario H. González Blanes, quien, conjuntamente con el Lic. Fernández Cuyar, en tal asunto interviniera, también, como abogado del Crédito & Ahorro (T. de E. 62 y 63).

"  .    .    .    .    .    .    .    .

"Pero hay más, como dice dicha corte inferior, aun cuando no hubiese habido, como hubo, toda la consideración expresada en la escritura, siendo un hecho indubitado que los compradores se hacían cargo de los gravámenes que pesaran sobre esos inmuebles y habiéndose verificado los pagos que ellos, además, hicieron, mediaría siempre causa suficiente en derecho. Véase *García* v. *Central Alianza, Inc.*, 69 D.P.R. 916; Manresa, Comentarios del Código Civil Español, t. 8 (2a. ed.) 1907, pág. 679."

En vista de todo lo expresado anteriormente se hace innecesario considerar, por improcedente, la doctrina de *fideicomiso constructivo* discutida por el apelante en su alegato.

Los hechos probados en este caso no dan margen a la aplicación de dicha doctrina.

Es innecesario también, en vista del resultado a que habremos de llegar, entrar a discutir la defensa de prescripción levantada por el demandado.

■ Los errores tercero y cuarto no fueron cometidos. Tampoco se cometió el primero. Por éste se imputa a la corte sentenciadora haber actuado movida por pasión, prejuicio y parcialidad. Del récord no se desprende tal cosa. Los incidentes ocurridos durante el juicio y señalados por el apelante para sostener este error, ni las manifestaciones de la corte en sus conclusiones respecto a la actitud y conducta observada por el demandante, son suficientes para sostener tal imputación.

■ Por el quinto y último error, el apelante impugna la imposición de la suma de $1,000 para honorarios de abogado. Arguye (1) que la corte a quo no hizo conclusión alguna de hecho o de derecho respecto a la temeridad del demandante, y (2) que el trabajo y el tiempo invertido en el litigio no justifican la concesión de una suma tan elevada.

Aunque en la sentencia apelada no se usa la palabra *"temeridad"*, es lógico suponer que al imponer al demandante el pago de honorarios de abogado ello se debió a que se le había considerado temerario. *Font* v. *Pastrana*, 73 D.P.R. 247. Aquí, al igual que en el caso de Font, tal conclusión está implícita en la opinión dictada ya que los términos en que la misma está redactada así lo revelan. Por otra parte, los autos revelan que la cuantía concedida por tal concepto es razonable. El error no fué cometido.

*La sentencia apelada será confirmada.*